# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

GEOFFREY NELS FIEGER &
RICHARD L. STEINBERG,

                PLAINTIFFS,

V.

MICHIGAN SUPREME COURT, *ET AL.*,

                DEFENDANTS.

_____/

CIVIL ACTION  NO. 06-11684

HONORABLE ARTHUR J. TARNOW
UNITED STATES DISTRICT JUDGE

MAGISTRATE MONA K. MAJZOUB

## OPINION

Pursuant to the Declaratory Judgment Act, Plaintiffs Fieger and Steinberg raise constitutional challenges to the Michigan Rules of Professional Conduct ["MRPC"] 3.5(c) and 6.5(a), often referred to as the courtesy and civility provisions ["courtesy provisions"].  Enacted by the Michigan Supreme Court, these rules place restrictions on attorney conduct, including attorney speech.  MRPC 3.5(c) applies to attorney conduct directed toward tribunals, whereas MRPC 6.5(a) relates to attorney conduct toward all persons involved in the legal process. Plaintiffs raise facial challenges to these courtesy provisions arguing that they violate both the First Amendment right to free speech and the Due Process Clause of the Fourteenth Amendment because they are overly broad and vague.

While Plaintiff Fieger was reprimanded under the challenged rules, Plaintiff Steinberg was not.  *Griev. Adm'r v. Fieger*, 476 Mich. 231 (2006).  This is not a challenge to the discipline imposed.  Rather the *Fieger* decision is cited for

Michigan's interpretation of the rules.

The Court finds the rules are unconstitutional on their face because they are both overly broad and vague. Thus, they violate the First Amendment right to free speech and the Fourteenth Amendment right to due process of law.

As interpreted by the Michigan Supreme Court, the State of Michigan's effort to regulate unprotected speech through the courtesy provisions causes a substantial amount of protected speech to be regulated as well. In addition, the courtesy provisions are so imprecise that persons of ordinary intelligence must guess at their meaning. Although it has long been recognized that states have legitimate interests in restricting attorney speech both to protect the fair administration of justice and to preserve the judiciary's integrity as well as the public's perception of it, these interests do not extinguish a Michigan attorney's First and Fourteenth Amendment constitutional rights to free speech and due process. Limiting an attorney's extrajudicial criticism of a branch of government in the name of preserving the judiciary's integrity is likely to have an unintended, deleterious effect upon the public's perception, since attorneys are often best suited to assess the performance of judges. As Supreme Court Justice Hugo Black wrote for the majority in *Bridges v. California*:

> The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion. For it is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions. And an enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect.

314 U.S. 252 (1941).

This Court finds there are no procedural bars to addressing the merits. Plaintiffs have standing to raise these challenges. Plaintiffs' claims are ripe for adjudication and are not barred by the doctrines of *res judicata* or claim preclusion. Finally, Defendants are not shielded by any doctrine of immunity.

> There is

> a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.

*New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (U.S. 1964).

In this case, the vague and overbroad courtesy provisions' that enforce silence in the name of preserving the dignity of the bench, does not override an attorney's right to speak her mind against public institutions, especially an elected judiciary, regardless of whether that speech is in good taste.

## I.     Merits

### A.     Declaratory Judgment Act

The power to hear cases under the Declaratory Judgment Act ["Act"] is discretionary. 28 U.S.C. § 2201(a); *see also Adrian Energy Assocs. v. Mich. PSC*, 481 F.3d 414, 421 (6th Cir. 2001) (Section 2201(a) "of the Act gives district courts statutory discretion to decide whether to entertain actions for declaratory judgments. Section 2201 explicitly provides that 'any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration.'") When deciding whether to exercise jurisdiction in a declaratory judgment action, courts are to look

to five factors:

> (1) whether the judgment would settle the controversy; (2) whether the declaratory judgment action would serve a useful purpose in clarifying the legal relations issues; (3) whether the declaratory remedy is being used merely for the purpose of 'procedural fencing' or 'to provide an arena for a race for *res judicata*'; (4) whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction; and (5) whether there is an alternative remedy that is better or more effective.

*Scottsdale Ins. Co. v. Roumph*, 211 F.3d 964, 965-68 (6th Cir. 2000).

Summary Judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. The moving party bears the initial responsibility of demonstrating that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). All inferences must be made in a light most favorable to the nonmoving party. *Matsushita Electrical Industrial Co. V. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In this case, a declaratory judgment finding the courtesy provisions vague and overbroad is appropriate. This judgment settles the controversy and clarifies the legal relations without encroaching on state jurisdiction.

### B.    Legitimate Interest

Political speech– speech about government issues or government officials– is "at the core of what the First Amendment is designed to protect." *Morse v. Frederick*, 127 S. Ct. 2618, 2626 (U.S. 2007)(citation omitted).

> Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs.

*Mills v. Alabama*, 384 U.S. 214, 218 (1966).

Since the judiciary is one branch of government and because "the action of state courts and judicial officers in their official capacities is to be regarded as action of the State within the meaning of the Fourteenth Amendment," it follows that attorney speech concerning a court's actions in a case is political speech. *Shelley v. Kramer*, 334 U.S. 1, 14 (1948).

In *Landmark Communications, Inc. v. Virginia*, the Supreme Court stated,

> [a]lthough it is assumed that judges will ignore the public clamor or media reports and editorials in reaching their decisions and by tradition will not respond to public commentary, the law gives judges as persons, or courts as institutions . . . no greater immunity from criticism than other persons or institutions. The operations of the courts and the judicial conduct of judges are matters of utmost public concern.

*Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 839 (U.S. 1978). Speech that concerns public affairs "is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964).

It should also be noted that an attorney's speech relating to a matter before a court is when an interest in that matter is likely at its height and when the speaker would have the widest audience for her ideas. *Bridges*, 314 U.S. at 268. Moreover, an attorney's speech during the pendency of a case can be beneficial to an individual client, to whom the attorney owes many duties, in terms of: 1) swaying the court of public opinion by countering adverse publicity; 2) gathering

crucial evidence; 3) encouraging settlement; 4) and engaging the public in discourse surrounding the issues of import in the particular case. *See* Erwin Chemerinsky, "Silence Is Not Golden: Protecting Lawyer Speech Under the First Amendment," 47 EMORY L.J. 859 (1998).

Despite the possible political importance of attorney speech and speech concerning pending cases, courts have affirmed certain restrictions to these categories to promote two separate but related interests. *See Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1066 (1991); *In re Snyder*, 472 U.S. 634 (1985); *In re Sawyer*, 360 U.S. 622 (1959); *Bates v. State Bar of Arizona*, 433 U.S. 350 (1977); *Peel v. Attorney Registration and Disciplinary Comm'n of Ill.*, 496 U.S. 91 (1990); *Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984).

The first and most immediate interest that rules of professional conduct, court rules and court orders seek to protect by restricting attorney speech is a party's right to a fair trial for the pending proceeding. This interest is often referred to as the fair administration of justice. "As officers of the court, court personnel and attorneys have a fiduciary responsibility not to engage in public debate that will rebound to the detriment of the accused or that will obstruct the fair administration of justice." *Neb. Press Assn. v. Stuart*, 427 U.S. 539, n. 27 (1976) (J., Brennan concurring). Most often these regulations take the form of rules of professional conduct relating to pretrial publicity and pre-trial gag orders. *Gentile*, *supra* (upholding rule of professional conduct and invalidating the safe harbor provision; *Neb. Press Assn.*, *supra* (addressing the constitutionality of prior restraints of a gag order on the press to protect a fair trial, not specifically attorney speech).

In *Gentile*, an attorney who held a press conference a day after his client's indictment accusing government officials of being corrupt was later disciplined under a rule of professional conduct relating to these extrajudicial statements. 501 U.S. at 1033-34. The Supreme Court held that Nevada's Rule of Professional Conduct which prohibited attorney speech that has a substantial likelihood of materially prejudicing an adjudicatory proceeding adhered to the principles of the First Amendment but was void for vagueness as interpreted. *Id*. at 1048; 1076.

The second, related but more general interest involves preserving the integrity of the legal process and the public's respect for the institution. The interest concerns the prejudice to the judiciary as a whole, as opposed to the prejudice in a particular case. Thus, the interest is a concern even when a case may not be pending.

In *In re Snyder*, the attorney speech at issue occurred when no case was pending making the interest in the fair administration of justice moot. The Supreme Court reversed the affirmation of an attorney's suspension and discipline for writing an ill-mannered letter criticizing the federal court's payment procedures for appointed counsel to a court employee charged with administrative responsibilities despite the general interest in prohibiting conduct prejudicial to the interests of justice. 472 U.S. at 645-46.

In addition, in *In re Sawyer*, during a high-profile criminal trial an attorney for one of the defendants made a public speech in which she described the "horrible and shocking" things that occurred at trial, the impossibility of a fair trial, the necessity of scrapping the rules of evidence if the government's case were proved, and the creation of new crimes unless the trial were stopped at once. 360

U.S. at 628-631.  The attorney received a one year suspension for her comments because she

> participated in a willful oral attack upon the administration of justice...
> and by direct statement and implication impugned the integrity of the
> judge presiding therein... and thus tended to also create disrespect for
> the courts of justice and judicial officers generally...

*Id*. at 623-626.

The Supreme Court noted that attorney speech made during the course of the trial that may obstruct justice may be more censurable, but found that the "charges and findings in [this case] no way turn on an allegation of obstruction of justice." *Id*. at 636.  In terms of impugning the integrity of the local courts, the majority determined that the record did not support the charge.  *Id*. at 628.

This distinction between these interests was discussed in *Bridges v. California*,

> the substantive evil... sought to be averted... appears to be double:
> disrespect for the judiciary; and disorderly and unfair administration
> of justice.

314 U.S. at 270.

In *Bridges*, the general interest in protecting the integrity of the bench was found to be not nearly as compelling because "the assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion."  *Id*.  Instead, "the other evil feared, disorderly and unfair administration of justice, is more plausibly associated with restricting publications which would touch upon pending litigation."  *Id*. at 271.

Although this interest distinction is not explicitly detailed in ensuing United States Supreme Court cases, the fact that this broad interest alone has not been relied upon to uphold an attorney speech regulation is telling.  *See In re Snyder, supra*; *In re Sawyer, supra*.  The interest in protecting the fair administration of justice is a more compelling interest than protecting the respect for the judiciary as a whole.  This was acknowledged in *In re Sawyer*, where the Court stated, "[r]emarks made during the course of a trial might tend to such obstruction of justice where remarks made afterwards would not."  360 U.S. at 636.

Both interests are based, at least in part, on the premise that attorneys have a unique position as officers of the court.

> Admission creates a license not only to advise and counsel clients but also to appear in court and try cases; as an officer of the court, a lawyer can cause a person to drop their private affairs and be called as witnesses in court, and for depositions and other pretrial process that, while subject to the ultimate control of the court, may be conducted outside courtrooms.  The license granted by the court requires members of the bar to conduct themselves in a manner compatible with the role of courts in the administration of justice.

*In re Snyder*, 472 U.S. at 644-45.

Restricting an attorney's freedom of speech in certain instances "reflects the burdens inherent in the attorney's dual obligations to clients and to the system of justice."  *Id*. at 644.

In terms of restricting attorney speech within the confines of the courtroom,

> [i]t is unquestionable that in the courtroom itself, during a judicial proceeding, whatever right to 'free speech' an attorney has is extremely circumscribed.

*Gentile*, 501 U.S. at 1071. In *Gentile*, the Supreme Court clarified that in promoting the fair administration of justice restrictions could extend beyond the courtroom during pending litigation.

> Even outside the courtroom... lawyers in pending cases [are] subject to ethical restrictions on speech to which an ordinary citizen would not be.

501 U.S. at 1071.

The majority in *Gentile* determined that because lawyers who represent clients in pending criminal cases are "key participants in the criminal justice system, the State may demand some adherence to the precepts of that system in regulating their speech as well as their conduct." *Id*. at 1074. As a result,

> [b]ecause lawyers have special access to information through discovery and client communications, their extrajudicial statements pose a threat to fairness of a pending proceeding since lawyers' statements are likely to be received as especially authoritative.

*Id*. at 1074.[1]

However where an attorney's speech is regulated that is removed from the courtroom, courts have "engaged in a balancing process, weighing the State's

---

[1]The Supreme Court did not discuss whether pending criminal cases were different than pending civil cases in the context of pervasive regulation of attorney speech. It should be noted that *In re Sawyer*, 360 U.S. 622 (1959), relied upon by both the Michigan Supreme Court in *Griev. Adm'r v. Fieger, infra,* and the Supreme Court in *Gentile* to expand the scope of attorney speech regulations also involved the regulation of attorney speech in order to ensure the impartial adjudication of criminal proceedings.

interest in the regulation of a specialized profession against a lawyer's First Amendment interest in the kind of speech that was at issue." *Id*. at 1073. Thus, the further an attorney's speech is from the judicial process or the closer it is to the end of a pending case, the less weight that should be given to a State's interests in regulating this specialized profession.

In *Gentile*, the Supreme Court rejected the argument that attorneys should only be subject to discipline if there were a "clear and present" danger to the fair administration of justice. *Id*. at 1070-1075. Instead, the 5-4 majority held that the ethical rule relating to pretrial publicity in a criminal case which restricted speech that creates a "substantial likelihood of material prejudice" adhered to the principles of the First Amendment, *Id*. at 1074-75.

The Michigan Supreme Court upheld the attorney speech-restricting courtesy provisions in *Griev. Adm'r v. Fieger* based on the generalized judicial integrity interest, as opposed to the individualized "fair administration of justice" interest. 476 Mich. 231 (2006). The majority determined that Michigan's legitimate interest in preserving the integrity of the legal system and in the "good moral character of the lawyers it has licensed" justified limiting discourteous and undignified attorney speech toward tribunals and others involved in the legal process during the pendency of a case. *Id*. at 261-62. Relying on *In re Sawyer* and *Gentile*, the Michigan Supreme Court determined that the application of the courtesy provisions transcends not only the courtroom, the judges' chambers, the pleadings filed with the court, the offices used for depositions, and areas that hold a specific nexus between the conduct and a judicial proceeding, but all the way to extrajudicial statements made on the proverbial street corner, at the meeting-hall,

on the radio, in the newspaper and even a one's household as long as a case is still pending, the comments concern the tribunal, and the comments are designed to reach the public and the court. *Id.* at 258-59.

In analyzing Plaintiffs' overbreadth and vagueness challenges, this Court acknowledges an attorney's unique position as both an officer of the court and an agent who owes certain duties to her client. This Court recognizes Michigan's legitimate interests in prescribing attorney conduct and speech to preserve the administration of justice and for the sake of judicial integrity. However, these interests are balanced against Plaintiffs' First Amendment right to criticize State action, especially in light of their position and specialized knowledge.

## C.    Overbreadth

The overbreadth doctrine provides an exception to the traditional rules of standing by allowing parties not yet affected by a statute or rule to bring actions under the First Amendment based on a belief that the regulation is so broad as to "chill" the exercise of free speech and expression. *Dambrot v. Central Michigan Univ.*, 55 F.3d 1177, 1182 (6th Cir. 1995). An overbreadth analysis focuses on the potential reach of a regulation requiring an inquiry into a rule's effect on constitutionally protected activity.

> In facial challenges to the overbreadth..., a court's... task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct.

*Houston v. Hill*, 482 U.S. 451, 458-59 (U.S. 1987) (quotation omitted). Judged in relation to the rule's plainly legitimate sweep, a substantial amount of protected speech "suffices to invalidate all enforcement of that law, until and unless a

limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression." *Virginia v. Hicks*, 539 U.S. 113, 118-119 (2003).

A substantially overbroad restriction of protected speech will be declared facially invalid unless it is "fairly subject to a limiting construction." *Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 577 (1987). In addressing an overbreadth claim, when a state court has interpreted a provision of state law, federal courts cannot ignore that interpretation, even if it is not the one that the court would have reached if it were construing the statute in the first instance. *Kolender v. Lawson*, 461 U.S. 352, 355 (1983).

MRPC 3.5(c) prohibits the "undignified or discourteous conduct toward the tribunal." Defendants point to the rules' commentary, the limitations read into these terms by *Griev. Adm'r v. Fieger*, *supra*, and the terms' "common understanding" as limits to the provisions. The comment to the rule appears to promote the more specific interest of protecting the parties' rights to a fair trial. The commentary states in part:

> The advocate's function is to present evidence and argument so that the cause may be decided according to law. Refraining from undignified or discourteous conduct is corollary of the advocate's right to speak on behalf of litigants. A lawyer may stand firm against abuse by a judge, but should avoid reciprocation; the judge's default is no justification for similar dereliction by an advocate. An advocate can present the cause, protect the record for subsequent review, and preserve professional integrity by patent firmness no less effectively than by belligerence or theatrics.

The fact that the other subdivisions of MRPC 3.5 pertain to the improper influencing and *ex parte* communications between attorneys and those involved with pending cases further demonstrates that the Rule appears to be designed to protect the fair administration of justice interest. *See* MRPC 3.5.

In interpreting the rule, the Michigan Supreme Court's opinion selected an expansive construction for the phrase "toward the tribunal." After consulting the dictionary, the majority defined "toward" as "in the direction of" and "with respect to." 476 Mich. at 251. This construction led the Court to include speech occurring both inside and outside the courtroom when made "in a forum designed to reach both the public and the [tribunal]." *Id.*

Additionally, the limit of pending litigation as outlined by the United States Supreme Court in *Gentile* was also interpreted to include its outermost limit. Under the Michigan Supreme Court's interpretation, a case is still pending and as a result the restrictions still apply throughout the time a party has to file for application to leave to the Michigan Supreme Court. *Id.* at 249. This applies even if the parties publicly decide against an appeal.

Finally, as Defendants admit, "[t]he Court did not define the words 'discourteous' or 'undignified' as Plaintiff Fieger's remarks in that case were indisputably 'discourteous' and 'undignified.'" Defendants Taylor, *et al.* Br. at 23. The Michigan Supreme Court appeared to hold that vulgarities, epithets, and personal abuse would fall within the rule's proscriptions but did not limit the rules to only this type of speech. *Griev. Adm'r*, 476 Mich. at 251, 256-57. Defendants rely on this interpretation claiming that the terms "discourteous" and "undignified" are terms of common understanding.

The Michigan Supreme Court interpreted MRPC 6.5(a) as applying to all persons involved in the legal process and requiring attorneys to treat such persons with "courtesy" and "respect."  The commentary promotes the general interest of protecting the integrity of the judicial process.

> A lawyer is an officer of the court who has sworn to uphold the federal and state constitutions, to proceed only by means that are truthful and honorable, and to avoid offensive personality.  It follows that such a professional must treat clients and third persons with courtesy and respect.  For many citizens, contact with a lawyer is the first or only contact with the legal system.  Respect for law and for legal institutions is diminished whenever a lawyer neglects the obligation to treat persons properly.  It is increased when obligation is met.

According to the Michigan Supreme Court, the purpose and interests for this rule are the same as they are for MRPC 3.5(c).  *Id.* at 252.

Defendants argue that in light of these narrowed constructions, the rules withstand constitutional scrutiny and are not overbroad, especially when read in light of the "complex code of behavior to which attorneys are subject."  *In re Snyder*, 472 U.S. at 647.  Defendants conclude that since these rules are "a call to discretion and civility, not to silence or censorship, and they do not even purport to prohibit criticism," the rules withstand Plaintiffs' First Amendment challenges.  *Griev. Adm'r*, 476 Mich. at 246.

In a challenge to facial overbreadth, this Court must determine whether within the rules' plainly legitimate sweep of unprotected speech, a substantial amount of protected speech is also regulated.  To begin, attorneys may be

sanctioned for impugning the integrity of a judge or the court if their statements are false, but truth may be a defense.

> [O]nly those false statements made with the high degree of awareness of their probable falsity demanded by [*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)] may be the subject of either civil or criminal sanctions.... Truth may not be subject of either civil or criminal sanctions where discussion of public affairs is concerned.

*Garrison v. La.*, 379 U.S. 64, 74 (1964)  In the area of attorney commercial speech, the truth defense was specifically contemplated.  *See Bates v. State Bar of Arizona*, 433 U.S. 350 (1977) (the flow of "truthful advertisement concerning the availability and terms of routine legal services... may not be restrained.")

However, truth is not an absolute defense in every situation involving attorney speech.  For example, truthful attorney speech may be regulated if the speech creates a "clear and present danger" to the fair administration of justice. *See Bridges*, 314 U.S at 261-263.  In addition, a pretrial gag order prohibiting the publishing or dissemination of truthful information did not offend the First Amendment in  *Seattle Times Co. v. Rhinehart*.  467 U.S. 20 (1984).  The Supreme Court in *Gentile* lowered the "clear and present danger" standard to allow restriction of truthful attorney speech that creates a "substantial likelihood of material prejudice" to the fair administration of justice in a pending case.  501 U.S. at 1074-75.  Neither the rules, the commentary, nor the Michigan Supreme Court's interpretation limits the rules to such standards.

As discussed above, the scope of speech that may be restricted is greater when done in the interest of promoting the fair administration of justice as opposed to protecting judicial integrity and the public's respect for the institution.  Neither

the rules, nor their interpretation by the Michigan Supreme Court makes this distinction. By conflating the two interests, the courtesy provisions restrict protected attorney speech that may bring disrespect for the judiciary even though it would not have an effect on the fair administration of justice.

Although the Michigan Supreme Court's decision attempts to define the contours of the rules, the opinion fails to actually limit the most expansive terms of the provisions, "discourteous" and "undignified." These terms were not defined because the majority believed that Fieger's remarks indisputably violated the rule. *Griev. Adm'r*, 476 Mich. at 256-57. Even though the majority acknowledged that vulgarities, epithets and personal abuse fall within the provisions, the Court did not limit the rules to only this class of language. *Id*. The sweep of the regulation was not limited to merely non-political speech, nor was it limited to purely false speech. Moreover, the opinion fails to address situations involving vulgar, truthful, yet political speech. Does the speech have to reach the level of defamation? Do the rules have to reach "the clear and present danger" to prejudicing the proceeding or merely the "substantial likelihood of material prejudice" standard announced in *Gentile*?

By leaving the terms undefined, the courtesy provisions regulate almost any conceivable arena of attorney expression and critical speech, both protected and unprotected, including speech that should permit "extensive public scrutiny and criticism." *Gentile*, 501 U.S. at 1035 (quotation omitted). As interpreted, the rules reach any criticism of the tribunal whether it is warranted or unwarranted, political or apolitical, truthful or false, vulgar or artful. There are no exceptions for truth,

for political speech, or for speech that does not create a "substantial likelihood of material prejudice" to a pending case.

In addition, the majority failed to differentiate between discourteous and undignified speech that may harm the fair administration of justice and the same type of speech that merely harms the dignity of the judiciary. In promoting the first interest, attorney speech is subject to more limitations based on a less stringent standard, "substantial likelihood of material prejudice." Whereas, when enforcing the rules to preserve judicial integrity, attorney speech should be subject to restriction based on a higher standard.

These rules, as they are now read, are unconstitutionally infirm. This general infirmity results first from a failure to incorporate within each provision any consideration of the interests the rules are trying to protect. Second, they include no standard for guidance, whether it be "substantially likely to materially prejudice" for protecting fair adjudication of pending litigation or the higher standard of "clear and present danger to pending ligation" to preserve the dignity of the judiciary. This Court does not believe that there can be a blanket prohibition on certain areas of comment without any consideration of these interests and their corresponding standards that the rules must meet in order to balance with an attorney's First Amendment rights. Yet these rules do establish such a blanket prohibition, whereby even a trivial, truthful and totally innocuous statement, although perhaps "discourteous" and "undignified" may be a violation. The First Amendment does not allow this broad sweep. Because the courtesy provisions, as interpreted by the Michigan Supreme Court regulate a substantial

amount of protected speech in their plainly legitimate sweep, the provisions are substantially overbroad on their face.

## D.    Vagueness

A vagueness inquiry pursuant to the Due Process Clause of the Fourteenth Amendment focuses on the imprecision of the regulation.

> Vagueness may take two forms, both of which result in a denial of due process. A vague ordinance denies fair notice of the standard of conduct to which a citizen is held accountable. At the same time an ordinance is void for vagueness if it is an unrestricted delegation of power, which in practice leaves the definition of its terms to law enforcement officers, and thereby invites arbitrary, discriminatory and overzealous enforcement.

*Dambrot v. Central Mich. Univ*., 55 F.3d 1177, 1183-1184 (6th Cir. 1995) (citations omitted).

Both failure of adequate notice and arbitrary and capricious enforcement can individually or collectively cause an unconstitutional "chill" to free speech.   To determine whether a law is unconstitutionally vague a Court must look to whether the statute is "so imprecise that persons of ordinary intelligence must guess at its meaning and may differ in their understanding to its application."   *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971).

In relation to the terms "discourteous" and "disrespectful," neither the courtesy provisions, nor their commentary, nor the Michigan Supreme Court's opinion in *Griev. Adm'r v. Fieger*, *supra*, provides the minimal requisite precision that would allow a person of ordinary intelligence to understand their meaning.  As discussed above, the rules and the commentary fail to define the terms.  Although the rules need not define an offense with "mathematical certainty," the vagueness

doctrine requires them to be precise enough so that a person of ordinary intelligence would understand their meaning.

The Michigan Supreme Court's interpretation also includes the inherent contradiction that the rules prohibit "discourteous" and "undignified" conduct but they are not a call "to silence or censorship, and they do not even purport to prohibit criticism." *Griev. Adm'r*, *supra* at 246. Moreover, this interpretation appears to conflict with Michigan Rule of Professional Conduct 3.6, which allows any extrajudicial statement if a lawyer knows or reasonably should know that it will not have a substantial likelihood of materially prejudicing an adjudicative proceeding.

The "precision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *NAACP v. Button*, 371 U.S. 415, 438 (1963). Defendants contend that the Michigan Supreme Court made clear that vulgar terms, epithets and personal abuse constitute what is prohibited by the rules, comporting with the terms' "common meaning" which would allow a person of ordinary intelligence to understand them.

However, this is belied by the record. Early in 2007, a Michigan State Senator, who happens to be an attorney, made certain comments about a federal judge stating that he was "out of control,' "not quite lucid," and that "something ought to be done about it" based on the judge's series of orders criticizing the health care of Michigan prisoners. "Lawmaker Rips Federal Judge Over Prisoner Health Rulings," David Eggert, Mlive.com, Associated Press 3/27/2007. During oral argument, the assistant Attorney General for the State of Michigan was asked as a member of the Michigan attorney community who is governed by these rules

whether she believed that these comments violated the courtesy provisions. Her initial response was, "I don't know… I need a more specific context to address that…". This example is precisely the point, that neither she, nor Plaintiffs, nor this Court knows the contours of these terms so that notice is properly given.

To highlight the fact that the courtesy provisions are both overbroad and vague, where is the line for attorney's criticism of the judiciary outside the judicial setting about a pending case? An attorney commenting, "the Court's opinion was wrongfully decided," might instead say:

- Today's ruling by the Court was a travesty of justice that has eroded the liberty of every citizen in the state of Michigan.
- After reading today's opinion, I believe that the Supreme Court is in the back pocket of special interest groups.
- O' wisest of wise panel of the Appellate Court, you are a modern day the Oracle of Delphi. Like the Oracle, you too must have been inhaling the intoxicating vapors when writing this decision.
- The majority's total disregard for United States Supreme Court precedent makes me wonder if the members of the court actually went to law school.
- Three monkeys with typewriters could have a written a more coherent opinion than the one issued today by the Supreme Court.
- Something should be done to those Judges.

As the list illustrates, the standards under these rules are shapeless. One person's courtesy may be another person's abomination. For example, a man extending his hand in greeting may be a courtesy to many. To others, it may be a violation of a fundamental belief. Thus, the chance of selective enforcement based on the judiciary's sensibilities is too great for these rules to withstand constitutional scrutiny.

The Michigan Supreme Court's failure to define the terms, the inherent

contradiction with its own ruling, the conflict with the State's pretrial publicity rule, and Plaintiffs' First Amendment rights to speech relating to the judicial process all lead this Court to find that the rules are also unconstitutionally vague. The rules as interpreted will not only lead to arbitrary enforcement, but they are so imprecise that persons of ordinary intelligence must guess at their meaning and may differ in their understanding to their application.

## II.    <u>Standing</u>

Defendants claim that Plaintiffs lack standing to bring suit because they have failed to present evidence of an actual injury.  It is well established that under the cases and controversy provision of Article III of the United States Constitution, a plaintiff must have standing to bring suit.  In order to demonstrate standing, a plaintiff must show that

> (1) he or she has "suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.
> ...
>
> In the context of a declaratory judgment action, allegations of past injury alone are not sufficient to confer standing.  The plaintiff must allege and/or "demonstrate actual present harm or a significant possibility of future harm."

*Fieger v. Ferry*, 471 F.3d 637, 643 (6th Cir. 2006) (*citations omitted*).

"[S]ome broadly written statutes may have such a deterrent effect on free expression that they should be subject to challenge even by a party whose own

conduct may be unprotected." *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 798 (1984) (citation omitted). Therefore the court has altered

> the traditional rules of standing to permit -- in the First Amendment area...attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity.

*Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973) (citation omitted).

> Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.

*Id.* Thus,

> [t]he overbreadth doctrine allows plaintiffs to attack the constitutionality of a statute or ordinance "not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others before the court to refrain from constitutionally protected speech or expression."

*Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 349 (6th Cir. 2007) (quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988)).

Recently the Sixth Circuit in *Prime Media* helped explain the intricacies of the standing requirement in First Amendment cases. 485 F.3d 343 (6th Cir. 2007). Plaintiffs challenged as both vague and overbroad under the Constitution a city ordinance that limited the size and height of billboards. The district court determined that even though the ordinance was content neutral, the height and size requirements were not narrowly tailored. The Sixth Circuit reversed the decision

finding that the requirements were sufficiently tailored for a content-neutral regulation. The case was then remanded to the district court to address previously unaddressed issues including plaintiff's First Amendment facial challenge to the entire ordinance. *Id*. at 347. On remand, the district court dismissed the suit for lack of standing. *Id*. Plaintiff appealed.

In addressing the issue of standing, the Sixth Circuit initially determined that the city's original permit rejection did not satisfy the injury in fact requirement, because the panel's prior decision found the ordinance to be sufficiently tailored to pass constitutional scrutiny in relation to that injury. *Id*. at 348. The Sixth Circuit then turned to whether the plaintiff had standing under the overbreadth doctrine, detailing the differences between constitutional standing and the prudential standing doctrine. The constitutional standing requirement "states a limitation on judicial power, not merely a factor to be balanced in the weighing of so-called 'prudential' considerations." *Id.* (quoting *Valley Forge Christian Coll. v. Americans United for Separation of Church and State*, 454 U.S. 464, 475 (1982)). Unlike the constitutional standing requirement, prudential standing is a judicially created doctrine that precludes litigation in federal court

> when the asserted harm is a "generalized grievance" shared in substantially equal measure by all or a large class of citizens," or where instead of litigating "his own legal rights and interests," the plaintiff instead purports to "rest his claim to relief on the legal rights or interests of third parties."

*Prime Media, Inc.*, 485 F.3d at 349 (quoting *Warth v. Seldin*, 422 U.S. 490, 499, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975)).

Based on these doctrines, the panel ruled that First Amendment overbreadth claims allow for an exception to the prudential standing doctrine but not an exception to Article III's injury in fact standing inquiry. *Id.*

Defendants argue that Plaintiffs have failed to establish an injury in fact sufficient to meet the constitutional standing requirement, similar to the plaintiff in *Prime Media*. Specifically, Defendants point to *Grendell v. Ohio Supreme Court,* where a plaintiff attorney brought an action for declaratory and injunctive relief against the Ohio Supreme Court to forestall the imposition of sanctions against him for filing a frivolous lawsuit, claiming the rule was unconstitutional under the Fifth and Fourteenth Amendments of the United States Constitution. 252 F.3d 828, 830 (6th Cir. 2001). Addressing the standing requirement in relation to past attorney sanctions, the Sixth Circuit in *Grendell* stated:

> Previous sanctions might be "evidence bearing on whether there is a real and immediate threat of repeated injury." However, where the threat of repeated injury is speculative or tenuous, there is no standing to seek injunctive relief.

*Id.* at 833 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). The Sixth Circuit concluded that the attorney lacked Article III standing to sue because he had not alleged a sufficient injury in fact, either based on his past exposure to sanctions by the Ohio Supreme Court or his assertion that the Ohio rule of practice "chilled" his exercise of protected conduct. *Id.* at 832-835.

Defendants' reliance upon *Grendell* is inappropriate because of the nature of sanctions and the attenuation of the threat of sanctions. In *Grendell*, plaintiff brought a frivolous mandamus action that was soon dismissed by the Ohio

Supreme Court. The respondents moved for sanctions based on their Ohio court rules and plaintiff failed to respond. As a result, the Ohio Supreme Court determined that sanctions were appropriate. Grendell responded by bringing suit in federal court to forestall the imposition of sanctions. He argued that the rule authorizing the sanctions was unconstitutional because they were imposed without notice and an opportunity to be heard. In defining what was required by the standing doctrine, the Sixth Circuit stated that Grendell was required

> to show a palpable threat of future injury necessary to achieve standing for declaratory and injunctive relief, Grendell must present evidence establishing: (1) that he is bringing or highly likely to bring a lawsuit before the Ohio Supreme Court; (2) that such lawsuit is allegedly frivolous, exposing him to sanctions under Rule XIV, § 5; (3) that the Ohio Supreme Court would, in its discretion, impose such sanctions; and (4) that the imposition of those sanctions would violate due process. Such a chain of events is simply too attenuated to establish injury in fact, and to confer the required standing in this case.

*Id*. at 833.

The likelihood that Plaintiff Fieger may again say something negative about a Michigan court that could subject him to further punishment under the courtesy provisions is not the attenuated situation presented in *Grendell*. Plaintiff Fieger is a vocal, often harsh, and at times vulgar critic of Michigan's judiciary. To prove that he has suffered an injury in fact, Plaintiff Fieger relies in part on the fact that he already has been subjected to disciplinary proceedings under the courtesy rules which have caused damage to his professional reputation and the considerable expense incurred to defend himself. As discussed, allegations of past injury alone are often not enough to confer standing upon a plaintiff, however "previous

sanctions might be evidence bearing on whether there is a real and immediate threat of repeated injury." *Grendell*, 252 F.3d at 833 (quotation omitted). Plaintiff Fieger has a reasonable belief that there is a significant possibility of future harm to him based on these rules. *Peoples Rights Org., Inc. v. City of Columbus*, 152 F.3d 522, 527 (6th Cir. 1998). Since the rules are both overly broad and vague, it would be difficult for either Plaintiff to conform their conduct to the rules.

Moreover unlike *Grendell*, Plaintiffs' challenge involves rules limiting the First Amendment activity of criticizing a public body, the enforcement of which may cause a chill to this Constitutional freedom. In *Grendell*, the Sixth Circuit was less than fully convinced that attorney sanctions for frivolous or harassing lawsuits implicated any First Amendment concerns, but assumed such for the sake of argument. 252 F.3d at 834. After making that assumption the Court found that Grendell could not "establish that his fear of unconstitutionally imposed sanctions" caused chilling "sufficient to confer standing." *Id.*

As the Supreme Court has stated in terms of the chilling effect, fears of prosecution cannot be merely "imaginary or speculative." *Younger v. Harris*, 401 U.S. 37, 42 (1971). In this case, there is an important First Amendment concern at issue, public discourse and criticism relating to a branch of government. Plaintiffs' political outspokenness is in stark contrast to Grendell's First Amendment concern of a right to file frivolous lawsuits. Plaintiffs' fear of prosecution is not merely imaginary or speculative, since at oral argument Defendants admitted that this was not the first time that Plaintiff Fieger has been threatened under these rules. Transcript of August 8, 2007 Hearing at 20 (the first instance involved a former Oakland County prosecutor where a complaint was filed but formal charges were

never brought).  As a result, this Court finds that Plaintiffs have standing to bring suit.

It should also be noted that if this Court were to adopt Defendants' standing argument, Plaintiffs would be stuck in a procedural rabbit hole that would result in Plaintiffs being forever precluded from possessing the requisite standing required for federal review.  When Plaintiffs first raised the facial challenge to the courtesy provisions at a time when a state grievance was pending, Defendants argued that abstention was required.  This Court agreed.  Now that the proceeding is not pending, Defendants claim that Plaintiffs lack standing to prospectively challenge the provisions because there is no pending grievance or proceeding.  At oral argument, Defendants were asked repeatedly if there would ever be a situation where a plaintiff would possess the requisite standing to facially challenge the courtesy provisions in a federal court.  Defendants pointed to the situation where an attorney had been disciplined but the discipline had then been set aside as inappropriate either by the Board, the Grievance panel, or the Michigan Supreme Court.  Defendants' response is too limited and would likely cause issues concerning the existence of an actual case or controversy to arise.

This "standing-abstention" combination was rejected by the Supreme Court in *Steffel v. Thompson*.  415 U.S. 452 (1974).  The plaintiff in *Steffel* was threatened several times with prosecution under a criminal trespass statute for distributing handbills in a shopping center.  On a day when plaintiff was again distributing handbills, the police arrived and threatened to arrest him.  Plaintiff left and later filed suit.  The district court dismissed the case for lack of standing.  The Supreme Court reversed in a unanimous opinion, because Plaintiff had a well-

founded threat of future prosecution sufficient to invoke the jurisdiction of the federal court under the Declaratory Judgment Act. *Id*. at 459. "In these circumstances, it is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Id*.

> [A] refusal on the part of the federal courts to intervene when no state proceeding is pending may place the hapless plaintiff between the Scylla of intentionally flouting state law and the Charybdis of forgoing what he believes to be constitutionally protected activity in order to avoid becoming enmeshed in a criminal proceeding.

*Id.* at 462.

In a January 7, 2007 majority opinion, Justice Scalia reiterated that standing can exist prior to a plaintiff's liability:

> Our analysis must begin with the recognition that, where threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat- for example, the constitutionality of a law threatened to be enforced. The plaintiff's own action (or inaction) in failing to violate the law eliminated the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction.

*MedImmune v. Genentech*, 127 S. Ct. 764, 772 (2007)(emphasis in original).

In analyzing the issue, the injury in fact requirement is satisfied when the threat of harm coerces the plaintiff into not doing something that the plaintiff claims she had the right to do. "The dilemma posed by that coercion -- putting the challenger to the choice between abandoning his rights or risking prosecution -- is a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate. *Id*. at 773 (quotation omitted).

Here Defendants prior enforcement of the courtesy provisions and the Michigan Supreme Court's interpretation of those provisions is just such a real and imminent government threat. This threat of discipline to attorneys for exercising their First Amendment right to criticize the judiciary, especially where the judiciary is elected, effectively coerces Plaintiffs to possibly forgo their exercise of fundamental right to free speech relating to politics. As a result, this Court agrees that Plaintiffs have standing to facially challenge the courtesy provisions.

## III.  Ripeness

Article III of the Constitution of the United States requires that parties seeking to invoke the power of federal courts must allege an actual case or controversy. *O'Shea v. Littleton*, 414 U.S. 488, 38 L. Ed. 2d 674, 94 S. Ct. 669 (1974). The rationale behind the ripeness doctrine "is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." *Thomas v. Union Carbide Agricultural Products, Co.*, 473 U.S. 568, 580 (1985). Determining ripeness in the context of the Declaratory Judgment Act, where the relief sought is prior to enforcement, is similar to the standing doctrine inquiry discussed above.

> [T]he ripeness doctrine not only depends on the finding of a case and controversy and hence jurisdiction under Article III, but it also requires that the court exercise its discretion to determine if judicial resolution would be desirable under all of the circumstances.

*Adult Video Ass'n v. United States Dep't of Justice,* 71 F.3d 563, 567 (6th Cir. 1995). A case is considered ripe in this context "if the probability of the future event occurring is substantial and of sufficient immediacy and reality to warrant the issuance of declaratory judgment." *Nat'l Rifle Assoc. of America v. Magaw*,

132 F.3d 272, 284 (6th Cir. 1997) (quotation omitted). The test for determining whether a case is ripe requires the Court to balance several factors including the likelihood that harm as alleged by Plaintiff will ever come to pass, whether the factual record is sufficiently developed to produce a fair adjudication of the merits, and an assessment of the hardships to parties if judicial relief is denied. *Adult Video Ass'n*, 71 F.3d at 567.

If the courtesy provisions are either vague or overly board, then the harm to Plaintiffs is a continuing harm, in that Plaintiffs' First Amendment free speech rights are being chilled. As discussed previously, Plaintiffs fear of further prosecution is reasonable based on their past experiences and the Michigan Supreme Court's interpretation of the rules.

In terms of the second factor, the factual record is sufficiently developed to produce a fair adjudication on the merits. The case involves the purely legal question of the constitutionality of the courtesy provisions as interpreted by the Michigan Supreme Court in *Griev. Adm'r v. Fieger*, *supra*.

Finally in terms of the hardships to the parties, if the courtesy provisions are unconstitutional Plaintiffs will suffer greater hardships through chilling effect on their free speech than the Defendants' hardship of not being able to enforce the provisions, as other remedies would still be available to the Court to punish certain types of speech and behavior in regulating Michigan attorneys.

Based on Plaintiffs' real fear, the likelihood that Plaintiffs will speak critically of the Michigan judicial branch, the completeness of the factual record for deciding this question of law, and the fact that Plaintiffs' hardships outweigh

those of the Defendants, this Court finds that Plaintiffs' claims are ripe for judicial review.

However, in relation to Defendants Kelly, Cavanagh and Weaver, there is no justiciable claim against them because there is no actual case or controversy between them and Plaintiffs. Justices Kelly, Cavanagh and Weaver dissented in *Griev. Adm'r v. Fieger* and instead determined that the courtesy provisions are unconstitutional. Thus, Plaintiffs cannot acquire declaratory relief where these particular Defendants have already provided such relief. Therefore, Defendants Kelly, Cavanagh and Weaver are DISMISSED from the case.

## IV. <u>Claim and Issue Preclusion</u>

The next procedural hurdle is whether the doctrines of claim and issue preclusion apply. The Full Faith and Credit Clause and Act, 28 U.S.C. § 1783 requires federal courts to "give the same preclusive effect to a state-court judgment as another court of that State would give." *Migra v. Warren City School Dist. Bd. of Ed.*, 465 U.S. 75, 80-82 (1984) (citation omitted).

### A. Claim Preclusion

In terms of concurrent jurisdiction, the entry of judgment by the state court before a federal court triggers preclusion law.

> *Res judicata* may bar any claims over which the federal courts have jurisdiction, including both claims of injuries caused by state-court judgment and general challenges to state statutes. Federal courts must give the same preclusive effect to a state-court judgment as that judgment received in the rendering state. 28 U.S.C. § 1738. Michigan recognizes two preclusion doctrines: *res judicata*, or claim preclusion; and collateral estoppel, or issue preclusion.
> ....
> Claim preclusion bars a second, subsequent action when (1) the

> prior action was decided on the merits, (2) both actions involve
> the same parties or their privies, and (3) the matter in the
> second case was, or could have been resolved in the first....
> Claim preclusion bars not only claims already litigated, but also
> every claim arising from the same transaction that the parties,
> exercising reasonable diligence could have raised but did not.

*Abbott v. Michigan*, 474 F.3d 324, 330-31 (6th Cir. 2007) (citations omitted).

Claim preclusion is designed to "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, prevent inconsistent decisions, encourage reliance on adjudication, and promote comity between the state and federal courts." *Dubuc v. Green Oak Twp.*, 312 F.3d 736, 744 (6th Cir. 2003) (citation omitted).

The July 31, 2006, Michigan Supreme Court decision in *Griev. Adm'r v. Fieger*, *supra*, satisfies the first prong of the claim preclusion test in relation to certain issues such as the as applied challenge and the definition of certain terms used in the statute.

"To be in privity is to be so identified in interest with another party that the first litigant represents the same legal right that the later litigant is trying to assert." *Adair v. State Dept. of Ed.*, 470 Mich. 105, 122 (2004). "[T]he outer limit of the doctrine traditionally requires both a 'substantial identity of interest' and 'a working functional relationship' in which the interests of the nonparty are presented and protected by the party in litigation.'" *Id.* at 122 (internal citation omitted). Plaintiff Fieger and Defendants in the original case, as an arm of the Michigan Supreme Court, are essentially the same parties with the same interests as they are in this case. Based on Michigan's privity law, Plaintiff Steinberg is

also likely in privity with Plaintiff Fieger because he seeks the same remedy, makes the same arguments, and alleges the same inquiry and therefore is "so identified" with the same interests as Plaintiff Fieger that he is in 'privity.' Thus, the second prong is also satisfied.

In terms of the third prong, the Court must look to the previous decision to determine what was and what could have been decided. In *Griev. Adm'r v. Fieger*, *supra*, the Michigan Supreme Court failed to address both facial challenges to the rules vagueness and overbreadth. The majority determined the question of vagueness need not be answered because "there is no question that the most casual reading of these rules would put a person on notice that the kind of language used by Mr. Fieger would violate" the rules. 476 Mich. at 254. The majority went on to find that the language was neither campaign nor political speech. It concluded by stating, "Mr. Fieger's comments are not protected under his various theories of vagueness, of political speech or of public figure comment." *Id*. at 262. Despite this, Defendants contend that the challenges raised here were or could have been raised in the context of the discipline enforcement.

However, the majority opinion refused to reach or consider an argument based on the facial validity of the courtesy rules because of the supposed obviousness that the remarks at hand violated the courtesy provisions. *Id*. at 254. The essence of an overbreadth argument is that the rule reaches both protected and unprotected speech. Thus, since the Michigan Supreme Court only decided that Plaintiff Fieger's specific comments violated the provisions, there is still the federal constitutional question as to whether the continued enforcement of such rule is overly broad in violation of the First and Fourteenth Amendments. The

issues were not decided by the Michigan Supreme Court.

Additionally, the issue before this Court could not have been decided in the previous litigation since it was only after the Michigan Supreme Court's decision in *Griev. Adm'r v. Fieger* that attorneys were given notice as to certain contours of the courtesy provisions.  Plaintiffs who now seek wholly prospective relief to preclude future prosecution under unconstitutional rules as limited by the recent decision are not estopped based on the doctrine *res judicata*.

## B. Issue Preclusion

The purpose of collateral estoppel is to shield litigants and the judicial system from the burden of relitigating identical issues to avoid inconsistent results.

> Where the issues of fact or law have been finally determined by a court of competent jurisdiction in one legal action which are essential to the maintenance of another legal action, it is universally held that the second action must fail.

*Jones v. Chambers*, 353 Mich. 674, 680 (1958).

> In Michigan, for collateral estoppel to apply three elements must be satisfied: (1) a question of fact essential to the judgment must have been actually litigated and determined by a valid and final judgment; (2) the same parties must have had a full [and fair] opportunity  to litigate the issue;' and (3) there must be mutuality of estoppel.

*Gilbert v. Ferry*, 413 F.3d 578, 580-581 (6th Cir. 2005) (quotations omitted).

Defendants argue that the first prong is satisfied because issues now raised were actually litigated and determined by the Michigan Supreme Court. Defendants point to decisions made by the Michigan Supreme Court that are material to this federal claim which include:

- The parameters of MRPC 3.5(c) and MRPC 6.5(a) prohibit "undignified," "discourteous" and "disrespectful" conduct or remarks. These rules do not purport to prohibit criticism but instead are a call to discretion and civility.
- The courtesy rules apply when a case is ongoing, and greater restraint is permissible when a case is ongoing than when it is completed.
- In the Court of Appeals, a case is still pending until after the expiration of the time for filing an application for leave to appeal to the Supreme Court and, if filed, until after the disposition of the case by that Court.
- The courtesy rules apply to comments made outside the courtroom as well as those inside the courtroom.

*See Griev. Adm'r v. Fieger*, *supra*

The Michigan Supreme Court concluded that the rules put attorneys on notice of the kind of language used by Fieger would violate courtesy provisions but yet they still are "undoubtedly flexible" and invite the exercise of some discretion in determining whether to charge an attorney with a violation. *Id*. at 254-55. Based on the interpretation of the courtesy provisions, the majority held that the courtesy rules do not preclude expressing disagreement with the judge or judges on a case but instead preclude expressing disagreement and criticism in terms that could bring disrepute on the legal system. *Id*. at 261. Further, the Michigan Supreme Court held that the rules vindicate the Michigan Supreme Court's interest in good moral character of the lawyers it has licensed to serve as officers of the court. *Id*. at 262

Based on these rulings, Defendants make the leap that Plaintiffs should be collaterally estopped from raising either a facial overbreadth or vagueness challenge. This Court agrees that the Michigan Supreme Court's limiting interpretation of the rules must be incorporated in a facial review of the provisions. However, this Court disagrees that based on these interpretational rulings Plaintiffs

should be forever precluded from federal review of the facial constitutionality of these provisions.

In *Wooley v. Maynard*, Maynard filed a declaratory action in federal court after the state court found that he violated state law after covering with tape part of New Hampshire's motto on his license plate. 430 U.S. 705, 706-709 (1977). A three-judge panel of the district court enjoined the state from arresting or prosecuting the Maynards at any time in the future for the conduct. *Id*. at 709. The Supreme Court rejected the attorney general's argument that Maynard failed to seek review of his conviction in the state court. The Court noted that Maynard was not seeking to set aside or annul his state court convictions but rather he sought to preclude future prosecution under an arguably unconstitutional law. *Id*. at 711.

> [T]he suit is in no way designed to annul the results of a state trial since the relief sought is wholly prospective, to preclude further prosecution under a statute alleged to violate appellees' constitutional rights... The Maynards seek only to be free from prosecutions for future violations of the same statutes.

*Id*.

Similar to the plaintiff in Maynard, Plaintiffs here seek to avoid future prosecution under unconstitutional rules as limited by the Michigan Supreme Court. The facial constitutionality of these statutes is reviewable as limited by the Michigan Supreme Court's findings in its decision in *Griev. Adm'r v. Fieger*, *supra*. Under Defendants' construction, Plaintiffs would be forever ensnared in an unescapable trap, despite the fact that the Michigan Supreme Court refused to answer certain issues. In its review of the rules, the Michigan Supreme Court was not merely answering questions of fact but also answering issues of law that may have been wrongfully decided.

Plaintiffs seek to challenge the constitutionality of the rules on its face as interpreted by the prior decision. Under Defendants' construction of collateral estoppel, Plaintiffs are now forever barred from such review, leaving the Michigan Supreme Court as the final arbiter of federal questions arising under the United States Constitution. This is inconsistent with the Supremacy Clause of the Constitution. U.S. Const., Art. IV, cl. 2.

## V. Immunity

### A. Legislative Immunity

Defendants claim that they are immune from suit based on legislative immunity. In *Supreme Court of Virginia v. Consumers Union for the United States, Inc.*, the United States Supreme Court determined whether the Virginia Supreme Court and its chief justice were officially immune from a 42 U.S.C. § 1983 action that constitutionally challenged the Virginia Court's disciplinary rules governing the conduct of attorneys. 446 U.S. 719 (1980). The Court held that in promulgating the Virginia Code of Professional Responsibility, the Virginia Supreme Court acted in its legislative capacity thereby making the court and its members immune from suit. *Id*. at 731-734. Nevertheless, the Virginia Supreme Court and its chief justice were held liable for their enforcement capacities since Virginia law gave the court independent authority on its own to initiate proceedings against attorneys. *Id*.

 Relying in part upon *Consumers Union,* the Sixth Circuit in *Abick v. Michigan* upheld the district court's grant of Eleventh Amendment legislative immunity to the Defendant Michigan Supreme Court and the individual justices. 803 F.2d 874, 878 (6th Cir. 1986). The Michigan Supreme Court enacted a new

service of process that conflicted with thirty-sixth district court's bailiffs' statutory right to be the exclusive servers for the district. *Id*. at 875. The bailiffs claimed that their property interest in their position was taken without due process or just compensation. *Id*. The individually named justices were found to be shielded from the suit by legislative immunity because the act of promulgating court rules relating to practice by the Michigan Supreme Court was considered a "legislative activity." *Id*. at 877-878.

While it is true that the Michigan Supreme Court's mere enactment of rules governing professional conduct is protected by legislative immunity in accordance with *Abick*, the Court and the Justices in their official capacities are liable in their enforcement capacities similar to those of *Consumer Union*. The Michigan Supreme Court has the inherent authority both to regulate (legislative capacity) and to discipline members (enforcement capacity) of the state bar and for more than 150 years has done so. This power is rooted in Art. 6 § 5 of the Michigan Constitution of 1963: the Michigan Supreme Court has "the power to regulate and discipline the Bar of this state." *In re Schlossberg v. State Bar Griev. Bd.*, 388 Mich. 389 (1972). In *Griev. Adm'r v. August*, the Supreme Court stated, "[t]he power to regulate *and discipline* members of the bar rests ultimately with this Court pursuant to constitutional mandate." 438 Mich. 296, 304 (1991) (*emphasis added*). Thus, the Michigan Supreme Court has the final say and not the Grievance Board or the Commission, who are merely entrusted with some ability to enforce the rules. Unlike *Abick* and similar to *Consumers Union,* the Michigan Supreme Court both has the legislative power and the enforcement power to regulate and

discipline attorneys.  Therefore, the individual justices are not entitled to legislative immunity based on their enforcement capacities.

**B.      Eleventh Amendment Argument**

Defendants also claim because the Michigan Supreme Court is an agency of the state and that the individual justices as well have been sued in their official capacities that they are immune under the Eleventh Amendment and that this does not fit within the *Ex Parte Young* exception.

> The Eleventh Amendment confirms the sovereign status of the States by shielding them from suits by individuals absent their consent. To ensure the enforcement of federal law, however, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law. This standard allows courts to order prospective relief, as well as measures ancillary to appropriate prospective relief. Federal courts may not award retrospective relief, for instance money damages or its equivalent, if the State invokes its immunity.

*Frew v. Hawkins*, 540 U.S. 431, 437 (U.S. 2004) (*citations omitted*).

Because the Plaintiff asks for preliminary and injunctive relief, Defendants argue that such relief would be retrospective.  This Court disagrees and finds that Plaintiffs seek prospective relief of the type contemplated by the *Ex Parte Young* exception.  209 U.S. 123 (1908).

## VI.    Conclusion

For these reasons, this Court finds that Michigan Rules of Professional Conduct 3.5(c) and 6.5(a) as interpreted by the Michigan Supreme Court opinion *Griev. Adm'r v. Fieger*, 476 Mich. 231 (2006), violate the First Amendment and the Due Process Clause of the Fourteenth Amendment because the provisions are both overbroad and vague. Therefore, declarative relief is granted.  Michigan Rules of Professional Conduct 3.5(c) and 6.5(a), referred to as the courtesy and civility provisions, shall not be enforced.

**IT IS SO ORDERED**.


S/Arthur J. Tarnow
Arthur J. Tarnow
United States District Judge

Dated:  September 4, 2007

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 4, 2007, by electronic and/or ordinary mail.

S/Catherine A. Pickles
Judicial Secretary